**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>  Plaintiff,<br><br>v.<br><br>Erfan Zarei,<br><br>  Defendant. | No. CR-13-01570-001-PHX-NVW<br><br>**ORDER** |

Before the court is the Government's motion to involuntarily medicate Defendant Erfan Zarei (Doc. 66). At the conclusion of an evidentiary hearing and oral argument on May 29, 2015, the court announced it would deny the Government's motion. This Order explains the reasons for that decision.

**I.    BACKGROUND**

On November 12, 2013, a grand jury indicted Zarei on one count of communicating a threat to injure another in interstate commerce, in violation of 18 U.S.C. § 875(c). (Doc. 11.) The Government alleges that in early October 2013, Federal Bureau of Investigation Special Agent Jason Larsen, who had previously interviewed Zarei for an unrelated investigation in 2005, started receiving "a series of telephone calls" from Zarei. (Doc. 3 at 3.) Special Agent Larsen was able to identify Zarei based on his voice and the number from which the calls originated. (*Id.*) In one voicemail, left on October 4, 2013, Zarei allegedly told Special Agent Larsen, "I need your supervisor's

number. I'm going to call this (unintelligible) mother fucker. I'm going to kill them, OK? Go tell your supervisor. This is ERFAN ZAREI. I'm going to kill you mother fuckers all." (*Id.* at 3-4.) Although it is not charged in the indictment, the Government's Complaint also alleges that around the same time, Zarei made "a series of threatening telephone calls" to the co-owners of a car dealership where he had previously worked. (*Id.* at 4.) In those calls, Zarei allegedly threatened to kill both co-owners and to rape the sister, wife, and mother of one of them. (*Id.*)

On January 3, 2014, the court referred Zarei to Deborah J. Lewis, Ph.D., for a psychological examination, pursuant to 18 U.S.C. §§ 4241, 4247. (Doc. 27 at 1.) Dr. Lewis concluded in a February 16, 2014 report that Zarei suffered from delusional disorder, persecutory type. (Doc. 29 at 10.) The court conducted a competency hearing on April 15, 2014, and ruled the next day that, in the language of 18 U.S.C. § 4241(a), Zarei was "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." (Doc. 38 at 1.) Zarei was thereafter evaluated by staff at the Federal Medical Center in Butner, North Carolina, to determine whether he could be restored to competency. (*Id.* (citing 18 U.S.C. § 4241(d)).)

In a report dated November 7, 2014, Dr. Alton Williams, a staff psychiatrist who examined Zarei at Butner, indicated that Zarei was still incompetent as a result of his delusional disorder but "vehemently denied having a mental illness and related that any such claim was part of a plot to keep him silent and interfere with his ability to expose the alleged perpetrators." (Doc. 48 at 5, 7-8.) Dr. Williams believed there was "a substantial probability [Zarei's] competency [could] be restored in the foreseeable future if treated with psychotropic medication." (*Id.* at 8.) Zarei, however, refused to take the suggested medication. (*Id.*) Without "antipsychotic and/or other medication as indicated for his underlying condition," Dr. Williams wrote, "Mr. Zarei is substantially unlikely to attain the ability to fully appreciate the nature and consequences of the proceedings against him

or to assist properly in his defense." (*Id.*) Dr. Williams and the Government therefore requested authorization to medicate Zarei involuntarily so he could stand trial. (*Id.*; Doc. 66 at 1.) Specifically, Dr. Williams proposed a regimen of "long acting injections" of antipsychotic medications, administered once every two to four weeks. (Doc. 48 at 9, 17.)

Dr. Williams' report details the potentially quite serious side effects those medications can cause. The report mentions three potential drugs, all of which "appear to have equal efficacy in the treatment of psychotic symptoms": haloperidol, fluphenazine, and risperidone. (*Id.* at 9.) The former two are "first generation," or "conventional," medications; the latter is a "second generation," or "atypical," drug. (*Id.*)

Approximately thirty percent of patients on first-generation medications experience "neurological side effects called extrapyramidal symptoms," including parkinsonism ("stiffness, shuffling, tremor, akinesia, slow movements, stooped posture and difficulty walking"), akathisia ("an inner sense of restlessness and urge to move continually . . . reflected by rocking, constant motion of feet, and crossing and uncrossing of legs"), and dystonic symptoms ("sustained excessive contraction of muscle groups," such as "rolling back of the eyes and arching of the neck" and "arching of the body in the neck, jaw, back, and tongue producing twisting abnormal postures"). (*Id.* at 10-11.) Each of these sets of symptoms can be treated to varying degrees with other medications, some of which in turn cause their own side effects. (*Id.* at 10-11.) In addition, long-term use of first-generation antipsychotic drugs can lead to "late-appearing, often irreversible" tardive syndromes. (*Id.* at 11.) For example, ten to twenty percent of patients display tardive dyskinesia, which "consists of rhythmic involuntary movements of the face (grimacing or frowning), lips (smacking, pursing, puckering), jaw (chewing and clenching), tongue (protruding or rolling), eyes (blinking or spasms)" and occasionally "the limbs (twitching or worm-like movements), the trunk (racking or twisting), and the diaphragm (gasping or forceful breathing)." (*Id.*) One to two percent of users experience "sustained muscle contraction of the face, eyes, neck, limbs, back or trunk," and eighteen

to forty percent suffer "persistent symptoms of akathisia." (*Id.*) In rare instances, first-generation antipsychotic medications can lead to sudden death or neuroleptic malignant syndrome. (*Id.* at 12.)

The same extrapyramidal and tardive side effects can result from second-generation medications, though at lower rates. (*Id.* at 13.) There can also be insomnia, agitation, anxiety, runny nose, and headache. (*Id.*) Unlike users of first-generation drugs, patients who consume risperidone are at an "intermediate risk for the development of metabolic syndrome," which "consists of abdominal obesity, insulin resistance, high blood pressure, and serum lipid abnormalities." (*Id.* at 13-14.) Physicians can manage metabolic syndrome with drug and non-drug interventions, but left untreated, "this syndrome can lead to significant medical complications such as the development of diabetes and medical illness associated with increased serum lipids, particularly cardiovascular disease." (*Id.* at 14.)

In his report, Dr. Williams also discusses the effectiveness of the three proposed drugs. A 2007 "retrospective chart review of patients who had undergone involuntary treatment, without randomization or a placebo control arm," found that seventeen of those twenty-two defendants "had improved sufficiently to be considered restored to competency status." (*Id.* at 15.) Another study, published in 2012, examined all defendants who had been involuntarily medicated in federal criminal cases during a six-year period. (*Id.* at 16.) Out of 132 total defendants, seventy-nine percent were restored to competency. (*Id.*) Finally, Dr. Williams opined that Zarei's "delusions and disorganized thinking prevents him from viewing himself as mentally ill," with the result that psychotherapy alone is unlikely to restore him to competency. (*See id.* at 16-17.) Dr. Williams testified consistent with his report at the May 29, 2015 evidentiary hearing.

II.   **LEGAL ANALYSIS**

The Supreme Court held in *Sell v. United States*, 539 U.S. 166 (2003), that "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a

mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial," but only in "rare" circumstances. 539 U.S. at 179-80. To obtain an involuntary-medication order under *Sell*, the Government must show, by clear and convincing evidence, that (1) "*important* governmental interests are at stake," (2) "involuntary medication will *significantly further* those concomitant state interests," (3) "involuntary medication is *necessary* to further those interests," and (4) "administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition." *Id.* at 180-81 (emphasis in original); *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 692 (9th Cir. 2010) (adopting clear-and-convincing standard).

Here, there can be no doubt that the Government's interests are important. The Government provided an audio recording of five voicemails Zarei left on Special Agent Larsen's phone, all of which exhibit incoherent anger and profanity. At only one point does Zarei say anything that can be interpreted as a threat to kill Special Agent Larson. But the Government must take seriously any risks to its agents' safety, and it acted prudently in bringing charges against Zarei. Zarei stipulated at the May 29, 2015 *Sell* hearing that the Government had satisfied the first of *Sell*'s four prongs.

The "Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell,* 539 U.S. at 180. In the Ninth Circuit, the "appropriate starting point for the analysis of a crime's seriousness" is "the likely guideline range." *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008). This analysis calls for consideration of both "the current charge against [a] Defendant" and "other relevant factors such as [a] Defendant's prior offenses, the predatory nature of those offenses, and the closeness in time of the prior offenses to the current prosecution." *See id.*

Under the Sentencing Guidelines, a conviction for violating 18 U.S.C. § 875(c) has a base offense level of 12. U.S. Sentencing Guidelines Manual § 2A6.1(a) (2014). The parties disagree about which specific offense characteristics should apply and about the details of Zarei's prior criminal record, although they both place him in Criminal History Category III. Zarei maintains the appropriate Guidelines range is 8-14 months,

while the Government believes it is 21-27 months.  Zarei has already been in custody almost twenty months, since October 2013.  (Doc. 6.)  Were Zarei to be involuntarily medicated, it would be at least another seven or eight months before he could be restored to competency and brought to trial, plus an additional three months before sentencing.

In at least one respect—regarding the application of § 2A6.1(b)(6), which provides for a four-level reduction if the offense "involved a single instance evidencing little or no deliberation"—Zarei may have the better view of the Guidelines.  But the present motion does not require resolving that dispute.  Even under the Government's view of the appropriate Guidelines range, the court concludes with confidence that it would not sentence Zarei to more time than he has already served, considering all the circumstances, including his mental illness.  That would not count the additional ten to eleven months needed to medicate, restore competency, try, convict, and sentence him.

The Government's interest in prosecuting Zarei is broader than individual punishment and specific deterrence.  A prosecution for threatening a law enforcement officer also serves more general deterrence.  Protecting the public by rehabilitating Zarei is a proper governmental purpose, but that purpose can be served by civil processes for commitment of the seriously mentally ill who are a danger to self or others.

In summary, the Government's interest in prosecuting Zarei is plainly important. But "[s]pecial circumstances may lessen the importance of" the Government's interest in prosecution.  *Sell*, 539 U.S. at 180.  In particular, "the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed)" may undermine the importance of proceeding to conviction.  *Id.* (citation omitted).  Although *Sell* discusses this consideration under the first prong—the importance of the Government's interests—it could just as well be weighed under the third prong—the necessity of involuntary medication to further those interests.

Prong three of *Sell* asks whether the "involuntary medication is *necessary* to further those [Government] interests."  *Id.* at 181 (emphasis in original).  As part of this

1 inquiry, courts examine whether "any alternative, less intrusive treatments are unlikely
2 to" restore a defendant's competency.  *Id.*  The only evidence on this record is that no
3 other treatment will restore Zarei to competency.  But this fact alone does not establish
4 that involuntary medication is *necessary* to achieving the Government's interests in
5 incapacitation, deterrence, or rehabilitation.  Even successful treatment will not serve the
6 "*important* governmental interests . . . at stake," *id.* at 180 (emphasis in original), when
7 Zarei has already served the sentence he would receive if convicted.  Because those
8 interests have already been satisfied, an involuntary-medication order is not necessary to
9 achieving them.  The Government cannot satisfy prong three of *Sell*.

10 The second *Sell* prong requires that "administration of the drugs is substantially
11 likely to render the defendant competent to stand trial" and "substantially unlikely to
12 have side effects that will interfere significantly with the defendant's ability to assist
13 counsel in conducting a trial defense."  *Id.* at 181.  Counsel for Zarei noted that the only
14 two studies on which Dr. Williams relied suggested his preferred antipsychotic drugs had
15 success rates under eighty percent.  If correct, that is a sufficient success rate for this
16 treatment.  Counsel also objected to the potentially serious side effects of the
17 medications.  But those possible side effects do not likely "interfere significantly with the
18 defendant's ability to assist counsel in conducting a trial defense."  Counsel's objections
19 to the general health side effects of the treatments go more properly to the fourth *Sell*
20 prong.

21 That prong, to which counsel for Zarei devoted much of his questioning and
22 argument, looks at whether "administration of the drugs is *medically appropriat*e, *i.e.,* in
23 the patient's best medical interest in light of his medical condition."  *Id.* (emphasis in
24 original).  There is no suggestion that Zarei has any other medical condition that contra-
25 indicates the medication the Government seeks.  But the risks and costs of side effects
26 may weigh against the benefits of successful treatment.  That judgment is necessarily
27 individualized and dependent on all the circumstances and goals of the patient.  As with
28 many decisions about medical treatment, there can be no categorically right or wrong

choice. Many people are successfully treated with these medications and choose to stay on them, notwithstanding some side effects. The task before the court differs critically from the usual medical calculus precisely because the court, not the patient-defendant, must consider the importance of the Government's interest in prosecution and all the other interests of the defendant himself. It is irrelevant that the defendant puts no weight on the importance of the Government's interests. Considering all the medical evidence on this record, the balance of judgment might well favor the medication regime Dr. Williams proposes. But in the end this court need not make that specific judgment to deny the motion.

Counsel for Zarei argues for a per se rule that prong four is not satisfied unless the short-term medication will permanently cure a defendant's condition, without continuation of the medication. Counsel cites to *Ruiz-Gaxiola*, where the Ninth Circuit wrote, "There is no medical value to a medication regime that alleviates the mental disorder, if it does so at all, only for the short period of time necessary for trial preparation and the trial itself, while creating a risk of side-effects that would render the regime inappropriate for a patient's long-term treatment." 623 F.3d at 706. In other words, "Because the proposed course of medication could be considered medically appropriate treatment only for those patients who expect or hope to continue undergoing it indefinitely (and clearly any patient who must be forced to take the antipsychotic medication involuntarily is not in that category), 'the patient's best medical interest' cannot be measured . . . by evaluating the benefit and risk over the period of the trial only." *Id.*

The quoted passages from *Ruiz-Gaxiola* do not necessarily stand for the categorical proposition Zarei asserts. It stuffs the conclusion into the question to posit that the "risk of side-effects . . . would render the regime inappropriate for a patient's long-term treatment." That conclusion offers no guidance on how to decide that the side-effects make the treatment medically inappropriate. A course of treatment is incremental and revisable in light of medical developments, as Dr. Williams testified. Side-effects are

variable, often manageable, and may lead to termination of treatment, although some risk is irreducible. A patient does not decide once at the outset to continue treatment indefinitely, and neither does the court when ordering involuntary medication. A categorical rejection of involuntary treatment because continued success requires a free choice to continue treatment would be a momentous gloss on *Sell*, largely eliminating forced medication to restore competency on a basis foreign to medical reality.

Thus, Zarei's argument is circular. It assumes that because he opposes medication while incompetent, he would also choose to terminate his treatment and return to incompetency after having experienced mental health, forced upon him for trial. But if experiencing good mental health left a defendant wishing to maintain that health through the medication, then any medication that is effective through trial would satisfy even a formalistic requirement that the treatment be successful permanently. The more plausible reading of *Sell* may be that the forced medication need only be successful through trial, with no assumption that beliefs and choices caused by delusional mental illness will continue after the delusions are cured.

However, there is no need in this case to decide whether Zarei's reading of *Ruiz-Gaxiola* is correct. The *Ruiz-Gaxiola* opinion's discussion of this aspect of prong four appears to be dictum, as the Ninth Circuit had already determined in that case that involuntary medication was unjustified on multiple grounds. *See id.* at 688, 704. So it is here as well.

The Ninth Circuit has cautioned that the "*Sell* factors do not represent a balancing test." *Id.* at 691. That is, the strength of any one factor cannot compensate for the insufficiency of another. Each *Sell* requirement "must be found to be true before the forcible administration of psychotropic drugs may be considered constitutionally permissible." *Id.* The strength of the Government's interest in this type of prosecution does not justify involuntary medication in pursuit of a conviction for which Zarei has already been detained as long as any likely sentence. If he is found to be a danger to self or others or otherwise gravely and persistently disabled, civil mental health proceedings

- 9 -

may protect him and the public.  The Government's case for involuntary medication falls short regardless of exactly what analysis is required by the fourth prong of *Sell*.

IT IS THEREFORE ORDERED that the Government's motion to involuntarily medicate Defendant Erfan Zarei (Doc. 66) is denied.

Dated this 10th day of June, 2015.

*Neil V. Wake*
Neil V. Wake
United States District Judge